190 Ill. App.3d 664 (1989)
546 N.E.2d 1059
SOUTHERN ILLINOIS MEDICAL BUSINESS ASSOCIATES, Plaintiff-Appellee,
v.
TONY CAMILLO, Defendant-Appellant.
No. 5-87-0764.
Illinois Appellate Court  Fifth District.
Opinion filed October 30, 1989.
*665 Churchill & McDonnell, of Belleville (Allen D. Churchill and Daniel G. Donahue, of counsel), for appellant.
Farrell & Long, P.C., of Godfrey, and Salivar, Benson, Guest & Harms, of St. Louis, Missouri (J. Thomas Long and David C. Salivar, of counsel), for appellee.
Reversed and remanded.
JUSTICE GOLDENHERSH delivered the opinion of the court:
Defendant, Tony Camillo, appeals from the interlocutory order of the circuit court of Madison County pursuant to Supreme Court Rule 307(a)(107 Ill.2d R. 307(a)), which issued a preliminary injunction for plaintiff, Southern Illinois Medical Business Associates (SIMBA), a *666 partnership. The injunction restrained defendant from violating certain noncompetition and nonsolicitation clauses contained in an employment agreement between plaintiff and defendant. In this cause, the sole issue presented for appeal is whether the trial court was correct in granting the preliminary injunction to restrain defendant from violating the restrictive covenants in his employment contract. We reverse and remand.
Plaintiff is a partnership of four pathologists, namely, Drs. Parks, Tsai, Nanduri, and Nuernberger, that provides clinical and anatomical laboratory services for hospitals, physicians, and nursing homes in southern Illinois. Plaintiff has two offices, one in Collinsville and one in Centralia. Defendant was an employee of plaintiff hired on February 1, 1983, to develop primarily nursing home clients. Defendant had previous experience in soliciting business from nursing homes for laboratories. He began this career in 1976 by working for Appleton Laboratory in East St. Louis, where he received training in phlebotomy. In 1977, Appleton and SIMBA merged into Allied Medical Laboratory (Allied). The Allied partners were Steven Bickel, Dr. Parks, and Dr. Nuernberger. In 1980, Allied split and Dr. Parks and Dr. Nuernberger left Allied and reestablished SIMBA. After this split, defendant remained an employee of Allied under the direction of Steven Bickel. Defendant stayed with Allied for approximately six or seven months, and then terminated his employment with Allied and left this field to work for an industrial laboratory in Sauget.
Approximately one year later, defendant returned to Allied, where he remained employed until 1983. At that time, defendant terminated his employment with Allied because Steven Bickel was indicted for Public Aid vendor fraud. Prior to defendant's quitting, several of Allied's clients became uneasy about employing a laboratory whose director was accused of illegal activity, and on their own initiative, switched to other laboratories. A few of Allied's clients switched to SIMBA. Defendant then talked to Dr. Parks about employment with SIMBA. It was agreed that if defendant could bring enough of Allied's clients over to SIMBA to justify his salary, he could have a job with SIMBA. Defendant went to work on February 1, 1983, without a written contract. There was testimony that defendant was hired to develop nursing home and nonnursing home clients, to go to nursing homes to draw patients' blood and to schedule other phlebotomists to perform this service, as well as to service the four nursing homes that were already plaintiff's clients and had been since 1977. In return for this work, plaintiff provided defendant with a salary, an automobile, membership in a nursing home association, and an expense account. *667 Within six months of starting his job with plaintiff, defendant had brought 20 nursing home clients that were previously Allied's clients under contract with SIMBA. The contracts between SIMBA and the nursing homes were renewable annually but were subject to termination with 30 days' notice to plaintiff if a nursing home desired to discontinue the service supplied by plaintiff. In addition to these 24 clients, defendant also developed 15 other nursing home clients by using a cold calling method which consisted of soliciting potential clients through the "yellow pages" and a list of nursing homes defendant had obtained from the Illinois Health Care Association. Prior to defendant's leaving plaintiff's employ, only three of the original four nursing homes, and 11 of the 15 new homes, were still under contract with plaintiff. All nursing homes that defendant had brought with him from Allied remained under contract with plaintiff while defendant remained at SIMBA.
Plaintiff did not spend money training defendant nor did plaintiff provide defendant with any skills defendant did not already possess. Plaintiff did hire additional staff and expand its facilities in order to be able to service the new clients brought in by defendant. Plaintiff also took out a 20-year industrial bond to finance the expanding operation.
The services provided to nursing homes consisted of sending a phlebotomist to draw a patient's blood and take the sample back for laboratory testing. Not all of plaintiff's services were performed in its own lab. Some work was too specialized and had to be sent to a reference laboratory while sometimes it was more cost effective for plaintiff to refer the work to another laboratory. Moreover, the services defendant provided did not involve a skill or technique known only to defendant. However, defendant stated that he was the quintessential phlebotomist and was requested by name by several homes to be the phlebotomist sent to draw blood. Plaintiff's representatives did not acknowledge any favoritism toward defendant by their clients. All parties agreed that the type of business in which they were involved was highly competitive and clients were known to switch providers frequently.
On November 21, 1985, defendant gave written notice to terminate his employment with plaintiff, effective June 1, 1986, in order to pursue his own business interests. This resignation was given at a time when other employees' salaries were being cut 5% to 10% due to plaintiff's financial difficulties. After defendant submitted his resignation, plaintiff and defendant worked out a written one-year employment contract to begin January 1, 1986, at which time defendant's *668 salary increased from $25,000 to $33,000. He was also guaranteed his salary would not be reduced. Prior to signing the employment contract, defendant read the contract and negotiated changes. Defendant made no objection to the noncompetition and nonsolicitation clauses which provide:
"15. NON-COMPETITION AFTER TERMINATION. Employee agrees that in addition to any other limitation, for a period of two (2) years after the termination of his employment hereunder, except after termination caused by Employer in violation of the terms hereof, and unless otherwise specified herein, he will not directly or indirectly engage in or in any manner be connected with or employed by any person, firm or corporation in competition with Employer or engaged in providing pathological, laboratory or other similar kinds of services within a radius of fifty (50) miles of any office of Employer, its affiliates or subsidiaries.
In the event of a breach by Employee of the above described `non-competition' provisions, it is agreed that actual costs, injuries or damages sustained by Employer would be difficult if not impossible to ascertain, estimate or determine, and, therefore, liquidated damages to Employer in such event are hereby agreed to be the sum of Twenty-Five Thousand Dollars ($25,000.00) which sum shall forthwith become due and owing from Employee to Employer upon the occurrence of any such breach, and said sum is further agreed on as compensation for the damages suffered by Employer and not as a penalty.
16. SOLICITATION AFTER TERMINATION. Employee agrees that in addition to any other limitation, for a period of two (2) years after the termination of his employment hereunder, except after termination caused by Employer in violation of the terms hereof, and unless otherwise specified herein, he will not, on behalf of himself or on behalf of any other person, firm, or corporation, call on any of the customers, clients, or patients of Employer, or of any of its affiliates or subsidiaries for the purpose of soliciting and/or providing to any one or more of them any pathological, laboratory or other similar kinds of services, nor will he, in any way, directly or indirectly, for himself, or on behalf of any other person, firm or corporation, solicit, divert, or take away any customer of Employer, its affiliates or its subsidiaries."
The parties worked under this agreement until November 4, 1986, when defendant was notified by a letter signed by all partners, except *669 Dr. Parks, that his services would be terminated on February 4, 1987. Dr. Nuernberger testified that the termination notice was sent because defendant was often unlocatable between 8 a.m. and 5 p.m., his normal working hours. There was a question of whether he was actually working the hours he said he was working and whether he was providing the services he was supposed to be providing. Defendant was further informed that the termination had not been finalized, but had been given to defendant in order to get his attention. Should defendant's performance improve, the partners would renegotiate with defendant.
Defendant rejected the opportunity to correct the alleged deficiencies and stated in a letter dated November 21, 1986, both his intention to quit and his desire to go into his own business which would be a competitor of plaintiff. Defendant further stated in the letter that out of respect for Dr. Parks, he was "willing to pay fair market value for either the nursing home business or the entire clinical lab." Defendant explained that he must have a firm promise to negotiate the details by December 1, 1986.
Plaintiff did not exercise the termination. Instead, plaintiff and defendant agreed to extend the written contract through July 1, 1987, in order to give the parties time to work out a possible buy-out by defendant of plaintiff's nursing home business. Defendant was not the only potential purchaser of plaintiff. In the fall of 1986, plaintiff had decided to sell its laboratory business and advertised such sale to national laboratories. According to Dr. Nuernberger, defendant was treated like any other potential buyer and was given proprietary data consisting of plaintiff's total revenue and a breakdown of that revenue by nursing home. In addition, as part of the package that went to potential bidders, it was stated that "Tony Camillo is the main link to all but two or three of the nursing home accounts."
On March 31, 1987, defendant sent the partners of SIMBA a letter which stated that defendant could start a laboratory cheaper than purchasing SIMBA. He indicated that he had the support of all of SIMBA's nursing home clients, except two, and this support would allow him a comfortable margin of profit. Defendant also stated that SIMBA would stand to lose approximately $450,000 in income should defendant open his own laboratory.
In December 1986, defendant formed Metroplex with Dr. Edwin Jacks in order to explore the possibility of purchasing plaintiff's clinical laboratory business. At the time of the hearing on the preliminary injunction, defendant testified that he was still waiting on the certificate of incorporation from the State and that he was not a partner in *670 Metroplex. Dr. Jacks, however, stated that defendant was a partner in Metroplex and that Metroplex had already begun taking samples. Defendant and Dr. Jacks were proposed codirectors of the corporation. Ultimately, plaintiff and defendant were not able to agree on the terms of a purchase of SIMBA, although Dr. Jacks testified that Metroplex made an offer of $800,000. On September 16, 1987, defendant gave two weeks' notice, but actually left plaintiff's employ on September 23, 1987. Defendant also took with him four employees of plaintiff who began to work for Metroplex.
Sometime during September 1987, while defendant was still employed by plaintiff, he actively solicited plaintiff's nursing home business in an attempt to get them to use the services of Metroplex. After Dr. Parks wrote to the homes asking for a copy of their contracts with plaintiff, seven homes sent replies terminating their contracts. On September 21, 1987, Dr. Parks sent a memo to defendant asking for a complete list of nursing home contracts between plaintiff and each nursing home. In the memo, Dr. Parks explained that plaintiff's attorney was asking for such a list. Defendant wrote a reply on the bottom of the memo stating that the contracts which Dr. Parks sought were entered into in 1985 and no longer existed. Defendant further explained that the nursing homes he brought from Allied along with the ones he had developed during his employment with SIMBA had entered into contracts with him. Defendant offered Dr. Parks a list of those homes so Dr. Parks could contact them to determine whether they desired to be serviced by plaintiff or defendant. Defendant offered to release any homes wishing to remain with plaintiff.
On September 24, 1987, plaintiff appeared at an ex parte hearing at which a temporary restraining order was issued against defendant. On September 29, 1987, at 11:56 a.m., the temporary restraining order was returned served. Dr. Jacks testified that on that date and at that time he and defendant were at the office of the administrator of the Beverly Homes in an attempt to obtain that home's business. Dr. Jacks testified that was the only customer he and defendant had visited that week.
On October 1, 1987, defendant was at the Doctor's Clinic, as witnessed by Jan Vest, an employee of that clinic. Dr. Jacks is employed at the Doctor's Clinic as director of the laboratory. On that day, Vest saw vials of blood with plaintiff's requisition form attached. First, Jan Vest expressed his concern to defendant about the clinic's getting involved in defendant's legal problems. He then called Dr. Parks and informed him of the blood and, finally, told Dr. Jacks that he had called *671 Dr. Parks. Dr. Jacks then had the vials removed within 30 minutes and sent to Smith-Klein Laboratories. The results were returned to defendant's wife. She notified the phlebotomist employed by Metroplex of the results.
Arna Trotter, the office manager of SIMBA for 11 1/2 years, testified that after defendant left SIMBA, SIMBA received calls from four nursing homes, Eden Village, Beverly Homes, Salem Homes, and Cahokia Care Center, concerning the status of their contracts with plaintiff. Representatives of these homes had called SIMBA because defendant had been talking to them about servicing the homes, but they all believed they had contracts with SIMBA. This witness also testified that the nursing homes which terminated employment with SIMBA had accounted for $107,877 in revenues in 1987. This figure is misleading, however, as this was the sum that had been charged to the clients but plaintiff did not always collect the full amount, as when Medicare pays a percentage of a bill.
Ty Jones, employed as a laboratory pathology aide at Oliver Anderson Hospital, testified that on Sunday, October 4, 1987, defendant brought in a specimen from Cahokia Healthcare nursing home. It had a SIMBA requisition form with it. The results were called back to SIMBA, but SIMBA informed Jones that defendant was no longer in their employ.
The trial on this matter convened on October 5, 1987, and was concluded on October 9, 1987. The trial court entered its preliminary injunction on October 14, 1987.
 1, 2 The question presented for review is whether the trial court was correct in granting the preliminary injunction to restrain defendant from violating the restrictive covenants in his employment contract. A preliminary injunction is a provisional remedy granted before the hearing of a case on its merits in order to preserve the status quo, which is the last peaceable, uncontested status which preceded the pending litigation. (Instrumentalist Co. v. Band, Inc. (1985), 134 Ill. App.3d 884, 890-91, 480 N.E.2d 1271, 1278; Hydroaire, Inc. v. Sager (1981), 98 Ill. App.3d 758, 761, 424 N.E.2d 719, 722.) In order for a preliminary injunction to issue, the plaintiff must establish by a preponderance of the evidence that (1) he possesses a clear right or interest needing protection, (2) no adequate remedy at law exists, (3) irreparable harm will result if an injunction is not granted, and (4) there is a likelihood of success on the merits of the case. (McRand, Inc. v. Van Beelen (1985), 138 Ill. App.3d 1045, 486 N.E.2d 1306; The Packaging House, Inc. v. Hoffman (1983), 114 Ill. App.3d 284, 448 N.E.2d 947.) In addition to those criteria, the trial court must also *672 balance the equities or relative inconvenience to the parties and determine whether a greater burden will be imposed on the defendant by granting the injunction than on the plaintiff by denying it. (Hydroaire, Inc. v. Sager (1981), 98 Ill. App.3d 758, 424 N.E.2d 719; Booth v. Greber (1977), 48 Ill. App.3d 213, 363 N.E.2d 6.) Finally, the decision to grant or deny injunctive relief rests with the sound discretion of the trial court and will not be disturbed absent a clear showing of abuse. Hydroaire, Inc. v. Sager (1981), 98 Ill. App.3d 758, 424 N.E.2d 719.
 3, 4 The first district has been the leader in developing the law concerning whether an employer has any proprietary interest in his customers warranting the imposition of restrictive covenants in an employment contract. Our supreme court has not yet decided this issue, but has given us general guidance in this area of the law. In Canfield v. Spear (1969), 44 Ill.2d 49, 254 N.E.2d 433, the supreme court stated that in considering business relationships, a court should consider the question of injurious effect to the public in restricting the delivery of a service. In House of Vision, Inc. v. Hiyane (1967), 37 Ill.2d 32, 225 N.E.2d 21, our supreme court held that the enforceability of a restrictive agreement depends on the reasonableness of the agreement in terms of its effect on the parties to the agreement and on the public in general. Both the first and fourth districts have found that an employer may have a proprietary interest in its customers sufficient to warrant enforcement of noncompetition clauses between an employer and an employee. (See the first district cases of A.B. Dick Co. v. American Pro-tech (1987), 159 Ill. App.3d 786, 514 N.E.2d 45; Reinhardt Printing Co. v. Feld (1986), 142 Ill. App.3d 9, 490 N.E.2d 1302; McRand, Inc. v. Van Beelen (1985), 138 Ill. App.3d 1045, 486 N.E.2d 1306; Jefco Laboratories, Inc. v. Carroo (1985), 136 Ill. App.3d 793, 483 N.E.2d 999; Instrumentalist Co. v. Band, Inc. (1985), 134 Ill. App.3d 884, 480 N.E.2d 1273; and the fourth district case of Lee/O'Keefe Insurance Agency, Inc. v. Ferega (1987), 163 Ill. App.3d 997, 516 N.E.2d 1313.) However, because such covenants operate at least as partial restraints of trade, they are scrutinized carefully by the courts. (Hydroaire, Inc. v. Sager (1981), 98 Ill. App.3d 758, 424 N.E.2d 719.) A restrictive covenant may be held enforceable only if the time and territorial limitations are reasonable and the restrictions are reasonably necessary to protect a legitimate business interest of the employer, a determination which requires that the facts and circumstances of each individual case be scrutinized. Reinhardt Printing Co. v. Feld, 142 Ill. App.3d at 15, 490 N.E.2d at 1307; Instrumentalist Co. v. Band, Inc., 134 Ill. *673 App. 3d at 891-92, 480 N.E.2d at 1279.
In the instant case, defendant argues that plaintiff had no legitimate protectable business interest in its customers because he developed the clientele through his own efforts on the employer's behalf and in furtherance of his association with plaintiff. Defendant agrees that the four original homes, now three, which were serviced by plaintiff are close to a near-permanent relationship. Plaintiff responds that there is a protectable business interest, so that a covenant not to compete was a necessary part of the contract. Plaintiff further points out that such covenants are valid and enforceable when the limitations as to time and territory are not unreasonable and argues that in the instant case they were reasonable. We find there to be no legitimate, protectable business interest in any of plaintiff's clients.
 5, 6 We agree with the first district that there are two general situations in which an employer's proprietary interest in his customers may be found for the purposes of enforcing a covenant not to compete: (1) where, by the nature of the business, plaintiff has a near-permanent relationship with its customers and but for his or her employment, defendant would not have contact with them; or (2) where the former employee learned trade secrets or acquired other confidential information while in plaintiff's employ and subsequently attempted to use it for his or her own benefit. (Reinhardt Printing Co. v. Feld, 142 Ill. App.3d at 16, 490 N.E.2d at 1307; McRand, Inc. v. Van Beelen (1985), 138 Ill. App.3d 1045, 486 N.E.2d 1306; Instrumentalist Co. v. Band, Inc., 134 Ill. App.3d at 892, 480 N.E.2d at 1279.) In the instant case, plaintiff does not allege, nor does the evidence suggest, that defendant misappropriated trade secrets acquired through plaintiff. We, therefore, move directly to a discussion of whether a near-permanent relationship between plaintiff and its customers existed.
 7 The first district has developed a set of objective factors to be considered in determining whether a near-permanent relationship exists between an employer and its customers for the purpose of enforcing noncompetition covenants. These factors include the time, cost, and difficulty involved in developing and maintaining clientele, the parties' intention to remain affiliated for an indefinite period, and the continuity as well as the duration of the relationship. (A.B. Dick Co. v. American Pro-tech, 159 Ill. App.3d at 793, 514 N.E.2d at 49; Reinhardt Printing Co. v. Feld, 142 Ill. App.3d at 16, 490 N.E.2d at 1307; McRand, Inc. v. Van Beelen, 138 Ill. App.3d at 1051-53, 486 N.E.2d at 1311-12.) We must also ask the question, but for the job with the employer, would the employee have come into contact with *674 the customers? (McRand, Inc. v. Van Beelen, 138 Ill. App.3d at 1053, 486 N.E.2d at 1312; see also Cockerill v. Wilson (1972), 51 Ill.2d 179, 281 N.E.2d 648; Canfield v. Spear (1969), 44 Ill.2d 49, 254 N.E.2d 433.) We find these factors to be particularly realistic, as they can be adapted to even an inherently unstable industry. (See Reinhardt Printing Co. v. Feld (1986), 142 Ill. App.3d 9, 490 N.E.2d 1302.) We note that no one factor is to be given greater weight, but that these factors must be balanced. Most importantly, the trial court must exercise its discretion in reviewing these factors, and its decision will not be overturned absent a clear showing of abuse. With these caveats in mind, we adopt these factors and apply them to the instant case.
The number of years it takes to develop the clientele indicates the parties' intention to remain affiliated for long periods of time. (McRand, Inc. v. Van Beelen, 138 Ill. App.3d at 1051, 486 N.E.2d at 1311.) In the present case, there was no specific time offered to indicate how long it took to develop a client, but the tone of the testimony suggested that clients could be developed after only one, or more likely, a few meetings. Moreover, there was no specific testimony to indicate the amount of money it took to develop a client. There was testimony that defendant had an expense account which we presume was used to develop and maintain client relationships, but there was no indication of a large pecuniary investment in plaintiff's clients. We note, however, that three of plaintiff's clients had been using plaintiff's services since 1977. Obviously, much more time and money went into retaining these clients over the years. Defendant points out in his brief: "The only thing close to resembling a near-permanent relationship with plaintiff's nursing home clientele are the original four homes with which it started in 1977." We agree. But not even these homes attained a near-permanent status. The only factors balancing in plaintiff's favor are the continuity as well as the duration of the relationship. We agree that 12 years is a great deal of time to have kept a relationship; however, any one of these homes could cancel their contract with plaintiff with 30 days' notice. One home that had been using plaintiff's services since 1977 did just that in 1986. Moreover, all parties agreed that this was a highly competitive business and customers were changing providers constantly. In contrast to the three remaining original homes, all the testimony reflected that defendant had brought 20 homes over from Allied within six months of his employment with plaintiff. These 20 homes that defendant convinced to use SIMBA's services were the reason defendant had a job with plaintiff, and they remained with plaintiff throughout defendant's employment. The other 11 accounts defendant serviced while *675 with plaintiff were ones whose business defendant had solicited during his years with plaintiff, having done so by making cold calls on homes whose names he obtained through the "yellow pages" and through a list defendant obtained from the Illinois Health Care Association. Dr. Nuernberger's best judgment was that of these 31 homes, some had been serviced for five years, but most had been serviced less. In addition, defendant and Dr. Nuernberger both testified that the nursing home laboratory business was highly competitive and that homes often changed providers. On the other hand, the 11 homes defendant established while working for plaintiff were established at plaintiff's expense in terms of salary earned by defendant and whatever expenses it took to not only sign the original contracts with defendant but also to retain these clients. Additionally, plaintiff's name and reputation certainly played a factor in those clients' commitments to plaintiff for services. In our view, the evidence clearly established that the 20 nursing homes brought over with defendant were short-term, impermanent customers whose business defendant was able to solicit not because of his association with plaintiff, but rather, through defendant's own efforts on plaintiff's behalf and in furtherance of defendant's association with plaintiff. (Reinhardt Printing Co. v. Feld, 142 Ill. App.3d at 17, 490 N.E.2d at 1308.) The other 11 homes are a closer discretionary call; however, the record indicates that these homes, too, were established through defendant's own efforts on plaintiff's behalf. These 11 homes were not acquired by the use of confidential information such as a client list but were established through cold calls. Our decision that these 11 homes are not a legitimately protectable interest is based in large part on plaintiff's own statement made to potential buyers of SIMBA that "Tony Camillo is the main link to all but two or three of the nursing home accounts." Thus, we find the evidence was not sufficient to establish that plaintiff had a business interest in need of protection in any of its customers.
 8 In our view, it appears that plaintiff seeks to restrain defendant, for the most part, from contacting customers previously known and readily available to him. As we stated in Murphy v. Murphy (1975), 28 Ill. App.3d 475, 328 N.E.2d 642:
"While clientele may properly be called the customers of a particular business, they cannot be considered the `property' of that business. While a business can have a proprietary interest in lists of customers which it maintains, no business has a proprietary interest in the customers themselves." (28 Ill. App.3d at 478, 328 N.E.2d at 644.)
*676 In the instant case, a near-permanent relationship was not proven to exist between plaintiff and its customers. Neither was anything learned by defendant during his employment with plaintiff that would give him an unfair advantage. Rather, defendant was hired by plaintiff because he already possessed both the skill and the knowledge necessary to bring in new clients on plaintiff's behalf.
We also note that defendant did not originally work under an employment contract. It was not until almost three years after defendant began working for plaintiff that he was asked to sign one. The signing of this contract came after defendant gave his letter of resignation which criticized plaintiff's management. It also came at a time of economic distress when other employees' salaries were being cut by 5% to 10%. This employment contract, with its restrictive covenants, was an attempt to assure plaintiff that defendant would not become a competitor. We find that this contract was initiated by plaintiff to restrict competition rather than to protect any legitimate business interest.
Having failed to establish a protectable interest, plaintiff cannot show that it suffered irreparable injury or that it lacks an adequate remedy at law. (Hydroaire, Inc. v. Sager (1981), 98 Ill. App.3d 758, 767, 424 N.E.2d 719, 726.) Moreover, we find little to indicate that plaintiff will be prevented from competing on a fair and equal basis with defendant. Defendant has offered to give Dr. Parks a list of the clients that he has signed with Metroplex in order to give plaintiff the opportunity to secure new contracts with these nursing homes if such nursing homes so desire.
Plaintiff urges us not to adopt this two-part test, and thereby not consider whether a near-permanent relationship between plaintiff and its customers existed, but to follow Total Health Physicians, S.C. v. Barrientos (1987), 151 Ill. App.3d 726, 502 N.E.2d 1240, in which we found that restrictive covenants between a medical corporation and physicians were enforceable where the restraints as to time and territory were valid and would not cause the public undue hardship. However, we are able to distinguish Barrientos from the case at bar. In Barrientos, the plaintiff had a protectable interest in its patients. The defendant physicians had been provided patient lists, referrals, confidential advertising and marketing techniques, office space, clinical facilities and supplies, were assisted in obtaining hospital privileges, and could have the contractual restraints waived by the medical corporation upon payment of $50,000, whereas, in the instant case, defendant was provided a salary of $33,000 per annum, use of a car, an expense account and membership in a nursing home association. Furthermore, *677 unlike Barrientos, defendant was clearly the party that had the contacts to bring plaintiff new customers.
By our decision we do not mean to condone defendant's actions. Defendant's use of SIMBA requisition forms and almost verbatim SIMBA contracts after the formation of Metroplex was clearly hostile. So, too, was the state of confusion in which defendant left SIMBA's clients concerning the status of their contracts with SIMBA. Moreover, the trial court found:
"[O]n some questions, Camillo was evasive and vague. For example, Camillo was not forthright on questions relating to his part in forming Metro-plex. Camillo was impeached on matters pertaining to his letter to the SIMBA partners dated March 31, 1987. * * * Based upon these considerations, the Court finds that defendant was not a credible witness."
We also note that there is no question but that this was not a contract of adhesion. The record clearly establishes that defendant was given the opportunity to read over the contract and suggest changes. Defendant did not object to these restrictive covenants. We believe both parties were equally matched in what was, to say the least, a rocky relationship. Due to these considerations, we cannot say that plaintiff has no likelihood of success on the merits of this case. Plaintiff may well be entitled to compensation. We find only that there was no protectable interest on which to enter a preliminary injunction. In essence, plaintiff failed to show injury to a legitimate business interest separate and distinct from defendant's breach of the restrictive covenant in order to secure enforcement thereof through injunctive relief. Hydroaire, Inc. v. Sager (1981), 98 Ill. App.3d 758, 765, 424 N.E.2d 719, 725.
For the foregoing reasons, this court reverses and remands the order of the circuit court of Madison County for further proceedings not inconsistent with this opinion.
Reversed and remanded.
HOWERTON and CHAPMAN, JJ., concur.