SOUTHERN ILLINOIS MEDICAL BUSINESS ASSOCIATES, Plaintiff-Appellee, v. TONY CAMILLO, Defendant-Appellant.

Fifth District   No. 5—88—0507

Opinion filed February 22, 1991.

Churchill & McDonnell, of Belleville (Allen D. Churchill, of counsel), for appellant.

Farrell & Long, P.C., of Godfrey (J. Thomas Long and Phillip H. Hamilton, of counsel), for appellee.

JUSTICE GOLDENHERSH delivered the opinion of the court:

Defendant, Tony Camillo, appeals from an order of the circuit court of Madison County holding him in indirect civil contempt for his wilful failure to obey a preliminary injunction issued in favor of plaintiff, Southern Illinois Medical Business Associates (SIMBA), against defendant. In a separate hearing, plaintiff's reasonable attorney fees were found to be $20,193.79. The circuit court ordered that defendant could purge himself of the contempt by paying the clerk of the circuit court on behalf of plaintiff the $20,193.79.

This is not the first time these parties have been before this court. Initially, this case began when a temporary restraining order was issued at an *ex parte* hearing against defendant, an ex-employee of plaintiff, on September 24, 1987. The temporary restraining order was initiated by plaintiff after defendant formed his own company, Metroplex, which was in direct competition with plaintiff and which was contrary to an employment contract between the parties. On September 29, 1987, at 11:56 a.m., defendant was served with the temporary restraining order. On October 14, 1987, after a hearing, the circuit court entered a preliminary injunction in favor of plaintiff and against defendant, from which defendant appealed to this court. Thereafter, on March 1, 1988, while the injunction was in effect and before defendant's appeal on the preliminary injunction was heard by this court, plaintiff filed a contempt petition against defendant for allegedly violating the preliminary injunction. Testimony was taken at a hearing on plaintiff's contempt petition beginning on March 31, 1988, and resuming on April 19, 1988. On July 19, 1988, the circuit court entered its order finding defendant in contempt for violations of the preliminary injunction. On August 18, 1988, defendant filed his notice of appeal from the contempt order. On October 30, 1989, this court reversed the preliminary injunction order entered by the circuit court on October 14, 1987, finding that plaintiff had no legitimate protectable business interest in its customers. See *Southern Illinois Medical Business Associates v. Camillo* (1989), 190 Ill. App. 3d 664, 546 N.E.2d 1059.

In this cause, defendant raises three issues: (1) whether our reversal of the preliminary injunction causes the contempt order to fail; (2) whether the order requiring defendant to pay plaintiff $20,193.79 for its attorney fees should be reversed; and (3) whether the contempt order is contrary to the manifest weight of the evidence. We affirm.

All facts necessary for an understanding of the background of this litigation leading up to the preliminary injunction issued on October 14, 1987, are contained in *Southern Illinois Medical Business Associates v. Camillo* (1989), 190 Ill. App. 3d 664, 546 N.E.2d 1059, and need not be repeated here. The following facts were adduced at the contempt hearing.

The first witness to testify was defendant, who was called as an adverse witness pursuant to section 2—1102 of the Code of Civil Procedure (Ill. Rev. Stat. 1987, ch. 110, par. 2—1102). Defendant acknowledged that he was served with a temporary restraining order on September 29, 1987, and was further enjoined by a preliminary injunction entered on October 14, 1987. Defendant confirmed that his wife, Debbie Camillo, had a consulting company named DLC Consulting. DLC Consulting had a bank account over which defendant had signatory power. Defendant denied violating either the temporary restraining order or the preliminary injunction. He testified that in order to comply with the injunction, he had called the attorney who was handling the incorporation of Metroplex and told the attorney to take his name off the incorporation papers. Defendant denied making telephone calls to any nursing homes or businesses on behalf of Metroplex, even though he admitted that his telephone bill had substantially increased in the months of October and November 1987. Defendant attributed this increase to his wife's activity on behalf of Metroplex. Defendant's wife had assumed a position with Metroplex and was paid $800 every two weeks for her services by Dr. Jacks, originally defendant's partner in Metroplex, but now apparently the sole stockholder in Metroplex. Defendant denied ever drawing blood or performing any technical work on behalf of Metroplex. He denied supervising Metroplex employees. Defendant did admit that he took a Metroplex employee, Kimberly Lane, to Clinical and Biochemical Procedures, Inc., in St. Louis after he had been served with the temporary restraining order. Defendant stated that he took Kim to that office to drop off specimens because she was not sure how to get to the office. Defendant admitted making deposits to the bank on behalf of Metroplex, but claimed he did so only because his wife was tied up with other matters. Defendant denied negotiating a lease on behalf of Metroplex for the Kent Building, where the new Metroplex office is located, at 2105 Vandalia in Collinsville. Defendant ad-

mitted that he may have talked to some people from the real estate company about this property and may have even looked at the office space. Defendant also admitted making the first payroll to Metroplex employees in October of 1987 out of his own pocket. Defendant explained that he paid Metroplex employees because Dr. Jacks said Metroplex had no money and defendant felt responsible for their well-being, as he was the one who hired these employees. Defendant paid four employees out of his personal checking account, but was later reimbursed by Dr. Jacks. Defendant also made a $50 personal loan to Randy Cheatham, another employee of Metroplex.

The next witness to testify was Leona Peskar, co-owner of the J.E. Kent & Company Realtors and owner of the Kent Building, where Metroplex is now located. Peskar testified that defendant called her to ask about office space in the Kent Building. Initially defendant called and inquired about the price of the space and later stopped by to examine it. According to Peskar, defendant stated that he wanted "to go on a month-to-month with some type of blood testing thing." Peskar stated that she showed defendant the office space and received a deposit on behalf of Metroplex on October 23, 1987. Peskar was acquainted with defendant because she had been his agent on his residence. Finally, Peskar testified that she had not seen defendant on the premises since the deposit was made.

The next witness was Trina Barr, age 26, married, and an ex-employee of SIMBA and Metroplex. Barr testified that she began work for SIMBA in January 1986, and worked through September 1986, when she quit work to have a baby. She testified that she went back to work for SIMBA in September 1987, at defendant's request. Defendant had originally hired her at SIMBA to work as a phlebotomist and courier. While she was working at SIMBA, defendant told her of his plans to open Metroplex and asked her to join his staff. Barr agreed to work at Metroplex and signed a letter of resignation to SIMBA written by defendant on her behalf. Barr stated that she began to work for Metroplex on October 8, 1987. On that date, Metroplex was being operated out of defendant's garage. Barr arrived at 8:30 a.m. At that time, four other people were also there—defendant, Kimberly Lane, Theresa Kimball, and Randy Cheatham. According to Barr, these four were getting supplies set up and were spinning down blood that had been received earlier in the morning. Defendant told Barr that he had taken the supplies in his garage from SIMBA. Barr testified that the supplies allegedly taken by defendant from SIMBA included tubes, tape, needles, alcohol, and cotton. Barr testified that Metroplex operated out of defendant's garage for approximately one month. According to Barr,

defendant would call her between 8 p.m. and 10 p.m. each evening to tell her what nursing home she should go to the next day in order to draw patients' blood samples. After she and the other phlebotomists retrieved the samples, they would return to defendant's garage to spin down the blood in order to get it ready to take to a reference lab for testing. Defendant would then pass out reports of previously tested blood that needed to be taken back to the appropriate nursing homes. Barr stated she always received instructions from defendant, and in her mind, defendant was the boss. Barr met Dr. Jacks on only one occasion, when she went to his office to do blood work, but she never took instructions from Dr. Jacks. Barr testified that she took no instructions from Debbie Camillo. Barr stated that during October, she was paid by defendant. Defendant would either leave the check in her mailbox or have another Metroplex employee drop it off to her. After Metroplex moved its operation from defendant's garage to the Kent Building in November 1987, Barr assumed the positions of both phlebotomist and receptionist. Barr would go to nursing homes from approximately 5 a.m. to 8 or 8:30 a.m., and then return to the Metroplex office. Upon arrival, she would call defendant's home to let him know that she was in the office so that calls to Metroplex could be taken there. According to Barr, when no one was in the Metroplex office, calls to Metroplex were forwarded to defendant's home phone through a system of call-forwarding. Barr also testified that defendant had instructed her that if anyone called the office for him, she was to tell the caller that she did not know where defendant was or how to contact him. After she told the caller this, she was to beep defendant on his pager and let him know who had called him. She was also instructed to tell people who came to the office looking for him that he was not in the office and she did not know when he would be in. According to Barr, defendant instructed her to do these things because he had informed her that SIMBA had won the injunction, and he could not get caught at the Metroplex office. Barr testified that during the time she worked for Metroplex at its location in the Kent Building, from November to December 1987, defendant would come to the office approximately two to three times per week to deliver various items and just see how things were going. During this time, Barr did not see Dr. Jacks. She testified that Debbie Camillo did call on "a couple" of occasions and give her instructions. Barr testified that defendant instructed clients to pay at the Metroplex office. Barr would charge them rates based upon defendant's instructions to her. Additionally, Barr stated that defendant drew blood at the Kent Building on one occasion for a nurse from a nursing home in Troy. The nurse was not charged for this service because she was an employee. Barr testified

that she quit her job with Metroplex in November 1987, for three reasons: (1) because she was having trouble with baby-sitters, (2) because defendant made sexual advances toward her, and (3) because she did not feel right about working there after SIMBA had won the injunction. Barr also testified that she was friends with Kimberly Lane, another Metroplex employee. One evening Lane called defendant and then Barr talked to him on the telephone and invited him to join them for a drink. Barr stated that after she had quit her job with Metroplex, she returned for a Christmas party. At this time, Barr told the new Metroplex receptionist, Vickie Krawczyk, that she was pregnant with defendant's child. Barr testified that she did this as a joke and within five minutes told the receptionist that it was only a joke.

Barr testified that she asked defendant for a letter of reference when she quit her job at Metroplex. Although Barr was not seeking employment at that time, she felt it might be beneficial to have such a letter in the future. Barr stated that she asked defendant for the letter instead of Dr. Jacks because she really did not know Dr. Jacks and had always considered defendant her boss. Defendant told her he would give her the letter within a week, but she never received one. She did receive a letter which had been written by Vickie Krawczyk, who had signed Dr. Jacks' name at the bottom. Barr did not accept this letter. Barr stated that she became involved in this litigation when she called Arna Trotter, SIMBA's office manager, to apologize for the way in which she had left SIMBA and to tell Arna that she had taken some SIMBA equipment with her when she left. Barr explained that she did this to clear her conscience. She stated that she then met Arna for lunch and discussed Metroplex's operation. At Arna's request, Barr met with SIMBA's attorneys. Barr testified that she has been promised nothing for her testimony. Finally, Barr testified that defendant had called her at home approximately three to four weeks before this hearing and had stated:

"I would like to thank you for all the aggravation you've caused me. I want you to know if I ever see you out again I am not your friend and I don't want to speak to you and I think you're a bitch and a slut. I'll get you."

Barr reported this threat to Mr. Salivar at the Troy police department and to her husband.

The next witness to testify was Kimberly Lane. Lane testified that she had been married for 3½ years and that she had worked for SIMBA for 1½ months, from August 1987 through September 1987, before joining Metroplex. Defendant interviewed her for the job with SIMBA. During the interview, he informed her that he planned to start his own lab and asked her to come to work for him at the new lab when it began its

operation. Defendant trained Lane for three to four weeks while both worked at SIMBA. After she worked at SIMBA for six weeks, she resigned via a letter written by defendant and signed by her and went to work for Metroplex. The night before she went to work for Metroplex, defendant called her and gave her instructions for the next day. This routine was followed during Lane's employment with Metroplex. Lane testified that defendant was at his garage in the morning while the work was being done, that Dr. Jacks was never there, and that Debbie Camillo was occasionally present, but was not in charge. Lane testified that defendant paid her her first paycheck of $308. The rest of her checks came from a Metroplex account. Like Barr, defendant also told her that the supplies in his garage had come from SIMBA. Lane testified that sometime during the first week in October 1987, she and defendant went to Biochemical Procedures in St. Louis. While they were there, defendant talked to Dr. Toro, who was the owner of that laboratory, and to Dr. Watkins, who was the director. Defendant told them that he wanted them to do the reference work for Metroplex and then wanted to come to an agreement on cost. Defendant explained Metroplex requisitions to the doctors and then told them that the money from such requisitions would be used to pay Metroplex's employee's salaries.

After the Metroplex operation was relocated from defendant's garage to the Kent Building, Lane saw defendant at the office approximately two to three times per week in the mornings. However, in December 1987 or January 1988, defendant stopped coming to the office and Vickie, the new receptionist, began calling her with her instructions for the day. Lane testified that in October or November 1987, on one of her many trips to the lab in St. Louis, she was given a check for $3,200 or $3,300 made out to Metroplex. Defendant instructed her to give this check to his wife, Debbie. Lane testified that after the injunction was issued, she went to a small nursing home with defendant and Randy Cheatham and, at that time, defendant drew blood from a patient. She stated that she only saw Dr. Jacks one time during her employment with Metroplex, which lasted from the beginning of October 1987 until the end of February or the beginning of March 1988. Sometime in November or December 1987, defendant drove Lane to a nursing home in Waterloo to save her mileage. Defendant did not go into the home at that time.

Lane explained that she did not feel things were being done properly at Metroplex. In her opinion, it was not an honest business. Dr. Jacks had no authority, and she felt that defendant was not telling her the truth. She was unable to get a check stub which showed that the

proper taxes were being withheld. She felt that defendant's telephone calls to her were becoming increasingly sexually suggestive. Defendant would call her for no apparent work-related reason and would ask her what she was wearing. According to Lane, things at Metroplex really began to deteriorate in December when she and defendant rode together to St. Louis and defendant asked her for a Christmas kiss. Lane became involved in this litigation when she invited herself to the luncheon with Arna Trotter and Trina Barr. During this luncheon, Metroplex was discussed. The following week she again talked to Arna, who informed her that SIMBA's doctors and lawyers would like to talk to her. She decided to talk about Metroplex's problems because she felt it was the right thing to do. Lane stated that she kept her job with Metroplex for as long as she did because defendant had made the job sound so attractive, and she wanted to see if the promises made would materialize. Lane confirmed that she and Trina Barr were friends and that they had called defendant on one occasion and asked him to meet them for drinks.

The next witness to testify was Debbie Camillo, defendant's wife of nine years. She first testified concerning her DLC Consulting business, which was set up to sell insurance to nursing homes. Mrs. Camillo got involved in this business through her husband. The business did not flourish, and only one policy was sold. Mrs. Camillo admitted that the deposit on the Kent Building was paid out of her DLC bank account and that Dr. Jacks reimbursed her. She described her job with Metroplex as that of a bookkeeper. She does the billing and the payroll and also answers the phone after work hours and on weekends and holidays at her own home through a system of call-forwarding. She is paid $800 every two weeks for her services. The payroll is made through Metroplex's dealings with Clinical and Biochemical Procedures, Inc. This group pays Metroplex $6,400 per month. A check is given to a Metroplex phlebotomist when he or she drops off the blood samples at the reference lab. The check is then deposited into a Metroplex account. According to Mrs. Camillo, defendant had nothing to do with Metroplex after the beginning of October. It was her job to make a list of nursing homes that had to be serviced the next day and she would give that list to Randy Cheatham. Randy Cheatham would then contact the other phlebotomists sometime after 5 p.m. and tell them where to go the next day. Mrs. Camillo stated that she did not call Kim Lane or Trina Barr concerning their assignments, but they had called her several times to tell her that they had not heard from Randy Cheatham. Mrs. Camillo stated that the supplies in the garage came from an employee of the National Health Laboratories. In addition to the supplies, they were also furnished with

a printer for blood test reports. The printer was retrieved after defendant was enjoined. Mrs. Camillo agreed that defendant had written a check for $177 to start up telephone service for Metroplex out of the Camillos' joint account. The Camillos were later reimbursed by Dr. Jacks, who wrote a check to Debbie Camillo; however, defendant endorsed the check and deposited it into the couple's joint checking account.

Dr. Jacks was the next witness to testify. He stated that he is president of Metroplex and the sole stockholder. According to Dr. Jacks, since the injunction was issued, a concerted effort has been made to get defendant out of Metroplex's business, namely: (1) defendant's contact with customers has been brought to a halt; (2) defendant's garage operations have ceased; (3) Metroplex telephone service at defendant's home has been stopped; and (4) defendant has changed beepers. The Camillos have no equity interest in Metroplex. The rent and telephone payments made by the Camillos on behalf of Metroplex were later reimbursed by Dr. Jacks. Dr. Jacks also testified that he was the one to talk with the people from Kent Realty about the office space, but that Mrs. Camillo was the one that actually found the space on Vandalia Street. He denied ever talking to defendant about this space.

After Metroplex began work on October 1, 1987, Dr. Jacks was left with over 80 specimens that needed to be tested because the doctor who had originally agreed to test Metroplex's specimens no longer wanted to do it. Dr. Jacks then called another doctor at Clinical and Biochemical Procedures, Inc., who agreed to perform the Metroplex testing. Dr. Jacks denied that defendant had anything to do with setting up the arrangement between Metroplex and Clinical and Biochemical Procedures, Inc. Dr. Jacks also testified concerning Debbie Camillo's employment with Metroplex. First, he explained that Mrs. Camillo does not work out of the Kent Building office, but, rather, works out of her home because it is more convenient for her. Second, he stated that he purposely tried to limit talking to Mrs. Camillo about Metroplex when defendant was around. Third, he explained his decision to keep Mrs. Camillo as an employee of Metroplex even after the injunction was issued because he could trust her and because he needed her. He found her to be especially helpful in assisting in the licensing of Metroplex. Finally, he admitted that he did have some concerns about the propriety of Mrs. Camillo's working for Metroplex, but had decided that there was nothing wrong with this arrangement because she had not been enjoined. He agreed that defendant indirectly benefitted by his wife's employment with Metroplex because the money she earned paid the Camillo family bills.

On cross-examination, Dr. Jacks admitted that, after the injunction

was issued, he and defendant went to Park Colonial Nursing Home together. He stated that he did a culture on a patient's toe, but that defendant had done nothing. He also insisted that Metroplex was not using supplies taken from SIMBA. Instead, Metroplex is using equipment obtained from various reference laboratories which was furnished free of charge to Metroplex. According to Dr. Jacks, reference labs will furnish such equipment because the labs recoup this cost when Metroplex is billed for the actual testing on the specimens. Dr. Jacks admitted that sometime between October 1 and 14, 1987, defendant did take Trina Barr and Kimberly Lane over to the reference lab in St. Louis. Dr. Jacks instructed defendant to take these employees to the lab in order to familiarize them with the route. He explained that the lab is located in an undesirable area, and he did not want them to get lost.

Defendant then presented his case. He testified that he had no arrangements with Dr. Jacks pertaining to the operation of Metroplex. He stated that after the temporary restraining order was served on him, he stopped going to nursing homes for any reason. After the preliminary injunction was issued, defendant pressed Dr. Jacks to move the lab out of his garage. He admitted that he did go to look at office space for Metroplex to rent, but only because Dr. Jacks was "dragging his feet" on the matter. Defendant stated that after the injunction was entered, he stopped answering his phone at home in order to stay out of Metroplex business. Defendant denied taking any SIMBA equipment. He stated that he did have some boxes with the SIMBA logo in his garage, but that he had taken these empty boxes from SIMBA while he was still employed there.

Jeffrey Joe Eades, a sales representative for National Health Laboratories, was the next witness to testify for the defense. He testified that he set up an account with defendant on September 15, 1987. On September 28 or 29, he took a number of supplies to defendant's home so that defendant would be able to perform laboratory tests. Defendant was not charged for these supplies because it was included in the price of the lab tests that National Health Laboratories expected to charge Metroplex. Eades estimated that the amount of supplies he gave defendant would have lasted between two weeks and one month. Eades explained that he received specimens from defendant on October 1, 1987. After that, National Health Laboratories received nothing more. Eades stated that the reason for this abrupt halt had been explained to him by defendant to be due to the injunction that had been issued.

Defendant was then recalled as a witness. He testified that Trina Barr had threatened him by requesting a letter of recommendation and further requesting that defendant get her job back at Metroplex by talk-

ing to Dr. Jacks for her. According to defendant, Barr told him that he did not want "to piss her off."

Dr. Harry Parks, a SIMBA partner, was the next witness. He testified that he sent a letter, dated October 20, 1987, to each nursing home administrator who had cancelled their contracts with SIMBA since defendant's departure. The letter refers to the October 14 injunction and asks them to resume service with SIMBA. Dr. Parks admitted that he had no specific knowledge that defendant had violated the injunction.

The next witness was Ruth Ann Lowry, director of nurses at Cahokia Health Care Center. Lowry stated that she had known defendant since his employment with SIMBA and that she had not seen defendant at the Cahokia Health Care Center since October 1, 1987. According to Lowry, defendant called her and told her about the injunction. She then informed all nurses at the home that defendant was not to be allowed in the nursing home. Defendant also informed Lowry during this call that she could communicate with his wife concerning Metroplex business.

Vickie Krawczyk, the Metroplex receptionist since December 1, 1987, also testified. She stated that it is her job to call the phlebotomists each evening to tell them their assignments for the next day. She stated that defendant has never assigned her any work. Krawczyk explained that she was trained by Trina Barr during her first four days on the job. Barr has since quit, but continues to come by the Metroplex office to visit Kimberly Lane approximately one to two times per week. Krawczyk confirmed the story that Barr had told her that she was pregnant with defendant's child. However, according to Krawczyk, Barr did not tell her that this was only a joke until Barr left the office some 45 minutes later. Krawczyk also testified concerning Barr's request for a letter of recommendation. She stated that she typed a letter for Barr after Dr. Jacks instructed her to do so, but that Barr refused to accept the letter and stated that she wanted one from defendant. Krawczyk also testified that she has only seen defendant come to the office on two occasions— one time to have his own blood drawn for testing and a second time to attend the Metroplex Christmas party. Krawczyk testified that she is Randy Cheatham's girl friend and that defendant and Randy are good friends.

Randy Cheatham was the final witness. He stated that he is a Metroplex employee. Prior to employment with Metroplex, he was employed by SIMBA for three years and before that he was employed by Allied Labs. He has known defendant since both worked for SIMBA. He testified that while Metroplex operated out of the Camillos' garage, defendant did not supervise the phlebotomists. Instead, assignments were made by defendant's wife. Cheatham stated that he received his

first Metroplex paycheck from defendant and, at the same time, he received a $50 personal loan from defendant. Finally, Cheatham explained that he had drawn the blood from a nurse who had come by the Metroplex office for testing.

After consideration of the evidence, the circuit court found defendant in indirect civil contempt for wilfully failing to comply with the preliminary injunction order. The circuit court found that defendant was not a credible witness, being "sometimes equivocal and evasive under cross-examination."

The first issue we are asked to address is whether reversal of the preliminary injunction by this court causes the contempt order to fail. Defendant argues that it is contrary to the purpose of civil contempt and unjust to affirm a civil contempt order when the underlying order giving rise to the contempt order has been reversed. Plaintiff replies that reversal of the underlying order was based upon our finding that plaintiff did not have a protectable interest in its competitors, not because we found that the circuit court lacked jurisdiction. Therefore, defendant was required to obey the circuit court's order under pain of contempt. We agree.

■ The question posed by defendant is not novel. The same issue was addressed in *Cummings-Landau Laundry Machinery Co. v. Koplin* (1944), 386 Ill. 368, 54 N.E.2d 462. In that case our supreme court defined the issue as whether the vacation or reversal of an order granting an injunction abates all pending proceedings for contempt for a violation thereof. The *Koplin* court held that the order or judgment of a court having jurisdiction is to be obeyed no matter how clearly it may be erroneous and such rule applies whether the contempt be technically defined as criminal or civil. The court specifically stated:

> "If the case belongs to the general class of cases of which the court has jurisdiction, then it has jurisdiction to grant an injunction, although its order in granting the same may have been erroneously entered. The question of whether the court rightfully or erroneously granted the injunction is not open to litigation on a citation for contempt. If the court has jurisdiction of the cause, an injunction granted in the exercise of such jurisdiction must be obeyed. The only issue in the contempt proceedings is whether the injunction has been violated." (368 Ill. at 385, 54 N.E.2d at 469.)

Our supreme court has continued to follow its decision in Koplin.

In *Faris v. Faris* (1966), 35 Ill. 2d 305, 220 N.E.2d 210, the mother of a three-year-old girl petitioned for a writ of *habeas corpus* to secure her daughter from her husband. Upon the husband's failure to produce

the child as ordered by the circuit court, the husband was held in contempt and ordered committed to the county jail until he complied. On appeal to the supreme court, the father argued that since he did not have actual physical control of his daughter, as she had been taken to Texas, he was under no duty to produce the child. The *Faris* court disagreed with the father, finding that "[i]t is no answer that the child is not in the actual physical control of a respondent if the record as a whole indicates that he has made no effort to produce the child or is insincere in his defense." (35 Ill. 2d at 309, 220 N.E.2d at 213.) The *Faris* court, citing the *Koplin* decision, also found that "[o]ne is justified in refusing to comply with a court order only if such order is utterly void, but it is no defense in a contempt proceeding to show that the order was merely erroneous." (35 Ill. 2d at 309, 220 N.E.2d at 212.) The *Faris* court also stated that if a court has jurisdiction of the subject matter and of the parties, then the court's order must be obeyed until such time as it is set aside by either the issuing or the reviewing court. (35 Ill. 2d at 309, 220 N.E.2d at 212.) Other courts have continued to follow the line of reasoning set out by the supreme court that one must comply with a court order unless such order is utterly void and that it is no defense in a contempt proceeding to show that the order is merely erroneous. See *In re Marriage of Houston* (1986), 150 Ill. App. 3d 608, 615, 510 N.E.2d 1015, 1020; *People v. Halprin* (1983), 119 Ill. App. 3d 922, 930, 457 N.E.2d 1010, 1015-16; *Champaign County Bank & Trust Co. v. Brewer* (1978), 63 Ill. App. 3d 490, 493, 380 N.E.2d 54, 56; *Stern v. Stern* (1963), 40 Ill. App. 2d 374, 380-81, 188 N.E.2d 97, 100.

■ In the instant case, there is no doubt that the circuit court had jurisdiction over the subject matter and the parties when it issued its preliminary injunction. Defendant goes so far as to admit that the circuit court had the requisite jurisdiction. Nevertheless, defendant argues that he need not obey the circuit court's order if the circuit court's order is eventually overturned. Defendant calls our attention to *Schallau v. City of Northlake* (1979), 82 Ill. App. 3d 456, 403 N.E.2d 266, and *People ex rel. Scott v. Police Hall of Fame, Inc.* (1979), 69 Ill. App. 3d 501, 387 N.E.2d 856, to support his proposition. Both cases were civil contempt cases in which our colleagues on the Appellate Court, First District, determined that when an underlying order is reversed in such a case, the coercive purpose of the contempt order can no longer be served because it is no longer possible for the parties found in contempt to obey the original order. In such an event, a civil contempt finding falls with reversal of the underlying order. (*Schallau v. City of Northlake* (1979), 82 Ill. App. 3d 456, 467, 403 N.E.2d 266, 274; *People ex rel. Scott v. Police Hall of Fame, Inc.* (1979), 69 Ill. App. 3d 501, 504-

05, 387 N.E.2d 856, 859.) The logic of these cases comes from the distinction between criminal and civil contempt. Briefly stated, criminal contempt consists of acts tending to lessen the dignity or impede the process of the court, and such proceedings are instituted to vindicate the court's authority. Sanctions for criminal contempt are punitive in nature. (*Falcon, Ltd. v. Corr's Natural Beverages, Inc.* (1988), 173 Ill. App. 3d 291, 297, 527 N.E.2d 504, 508.) On the other hand, civil contempt typically consists of failing to do something ordered by a court and the result is a loss of benefit or advantage to the opposing party with the dignity of the court being only incidentally involved. (*Sullivan v. Sullivan* (1973), 16 Ill. App. 3d 549, 551-52, 306 N.E.2d 604, 605.) In a case of civil contempt, the reversal of the underlying order means that there was not a justifiable reason for ordering an opposing litigant to either perform or refrain from performing the activity complained of.

■■ We are concerned that the effects of the holdings in *Schallau* and *Police Hall of Fame* have the potential to disrupt the orderly administration of justice. Instead, we feel bound by our supreme court's decisions in *Koplin* and *Faris* that court orders must be obeyed until such time as they are set aside by a reviewing court or by the issuing court. This is the rule whether the contempt order is characterized as civil or criminal. To hold otherwise would encourage those who have been enjoined to disregard a circuit court's order if they believe, rightly or wrongly, that the underlying order would be overturned on appeal. Such an interpretation would severely impede our circuit court's power and effectiveness. As the *Koplin* court so eloquently stated:

> "It would certainly be an innovation and establish a dangerous precedent to hold that the power of a court to punish for contempt for a violation of its injunctional, or other, orders, is dependent upon the affirmance of such orders by the highest court to which an appeal might be taken. If that were the rule, the powers of courts to preserve the *status quo* of litigation during the pendency thereof, would be entirely frustrated. It has always been the rule that courts of equity have power, upon a proper showing, to preserve the status of the parties, as well as the subject matter of the litigation until its final determination. Neither the court nor the parties in interest, as a condition to the exercise of such power, must guarantee the final result. The rule that, even though the court may erroneously grant an injunction, the writ must be obeyed, is too well settled to admit of doubt." (386 Ill. at 386, 54 N.E.2d at 470.)

Therefore, the reversal of the preliminary injunction by this court did not cause the contempt order to fail.

The next issue we are asked to address is whether the order requiring defendant to pay $20,193.79 for plaintiff's attorney fees should be reversed. Defendant argues that the payment of plaintiff's attorney fees is a sanction which, by its very nature, is unwarranted under the facts of this case. Plaintiff responds that the award of attorney fees must be allowed to stand because attorney fees may be assessed against a party who violates a court's order. We agree.

■ It is generally accepted in civil and criminal contempt that an appropriate remedy may be to require the contemnor to bear the reasonable costs of the contempt proceeding, including the assessment of attorney fees. (*Frank B. Hall & Co. v. Payseur* (1981), 99 Ill. App. 3d 857, 862, 425 N.E.2d 1002, 1006.) In the instant case, even though the circuit court attached the label of "sanction" to the assessment of attorney fees against defendant, we are not bound to accept this label. We find the assessment of attorney fees to be damages directly attributable to defendant's violation of the injunction. But for defendant's violation of the injunction, plaintiff would not have had to incur over $20,000 in attorney fees. We believe that it is not unreasonable to require defendant to pay such costs.

Defendant cites the case of *Sullivan v. Sullivan* (1973), 16 Ill. App. 3d 549, 306 N.E.2d 604, in which an award of attorney fees was found to be improper because the order for contempt was improper. We find *Sullivan* to be distinguishable from the case at bar. In *Sullivan*, a husband appealed from orders of the circuit court finding him in contempt, sentencing him to 90 days' imprisonment, and assessing his wife's attorney fees against him for failure to pay child support as ordered. The Appellate Court, First District, reversed the circuit court's order, finding that the order for contempt was improper, first, because the order did not provide an amount the husband was required to pay, payment of which would have allowed the husband to purge himself of the contempt and, second, because there was no showing of wilful contempt. The *Sullivan* court determined that the husband's failure to pay was due to the husband's insolvency through no fault of his own. In the instant case, there is ample evidence in the record showing that the injunction had been flagrantly violated by defendant. Therefore, we find that the circuit court did not err in requiring defendant to pay plaintiff's attorney fees.

The final issue we are asked to address is whether the contempt order is contrary to the manifest weight of the evidence. Defendant contends that the contempt order in the instant case must be reversed because the circuit court's finding that defendant violated the injunction was against the manifest weight of the evidence. We disagree.

■ It is the circuit court's function to weigh evidence presented and to make findings of fact. Unless it is found that the circuit court's holding is manifestly against the weight of the evidence, a reviewing court will not disturb the circuit court's decision. (*Central Steel & Wire Co. v. Coating Research Corp.* (1977), 53 Ill. App. 3d 943, 947, 369 N.E.2d 140, 144.) In the instant case, the circuit court found that the following actions of defendant constituted contumacious conduct:

"(a) Camillo wrote personal checks for payroll salaries and telephone service for Metroplex, a direct competitor of SIMBA.

(b) Camillo participated in operating laboratory services from his home and garage on behalf of Metroplex.

(c) Camillo advised and assisted his wife, Debbie Camillo, in conducting business for Metroplex in direct competition with SIMBA."

Additionally, the circuit court found that defendant was not a credible witness.

■ As previously stated, we believe there is ample evidence in the record showing that the injunction had been flagrantly violated. Our exhaustive statement of facts in this cause demonstrates defendant's utter disregard for the injunction issued by the circuit court, and we see no cause to repeat those violations here. The facts support the circuit court's conclusion that defendant's acts constituted a violation of the injunction on more than one occasion. Such violations of a circuit court's order cannot be tolerated even if, as in the instant case, the order for injunction is later reversed because no protectable interest is found.

For the foregoing reasons, the order of the circuit court of Madison County is affirmed.

Affirmed.

LEWIS and CHAPMAN, JJ., concur.